UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

HOLLY MARIE PATTERSON,

        Petitioner,

                                          CASE NO. 2:12-CV-15658

v.                                 JUDGE VICTORIA A. ROBERTS

                                 MAGISTRATE JUDGE PAUL J. KOMIVES

MILLICENT WARREN,

        Respondent.

_____/

## REPORT AND RECOMMENDATION ON PETITIONER'S HABEAS APPLICATION (docket #1) and PETITIONER'S MOTION FOR BOND (docket #20)

I.       RECOMMENDATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
II.      REPORT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
       A.    *Procedural History* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
       B.    *Factual Background Underlying Petitioner's Conviction* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
       C.    *Procedural Default* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
       D.    *Standard of Review* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
       E.    *Sentencing (Claims I & II)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
           1.    *Guidelines Scoring (Claim I)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
           2.    *Judicial Factfinding (Claim I)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
           3.    *Proportionality (Claim II)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
                a. Clearly Established Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
                b. Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
           4.    *Sentence Based on Failure to Admit Guilt (Claim II)* . . . . . . . . . . . . . . . . . . . . . . 21
                a. Clearly Established Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
                b. Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
       F.    *Biased Juror (Claim III)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
           1.    *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
           2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
       G.    *Confrontation Clause (Claim IV)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
       H.    *Ineffective Assistance of Counsel (Claims III & IV)* . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
           1.    *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
           2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
                a. Biased Juror . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
                b. Failure to Raise Confrontation Objection . . . . . . . . . . . . . . . . . . . . . . . . . . 32
       I.    *Petitioner's Reply* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
       J.    *Petitioner's Motion for Bond* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
       K.    *Recommendation Regarding Certificate of Appealability* . . . . . . . . . . . . . . . . . . . . . . . . 38
           1.    *Legal Standard* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
           2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
       L.    *Conclusion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
III.     NOTICE TO PARTIES REGARDING OBJECTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

I.      RECOMMENDATION: The Court should deny petitioner's application for the writ of habeas corpus and should deny petitioner a certificate of appealability.  The Court should also deny petitioner's motion for bond.

II.     REPORT:

A.      *Procedural History*

1.      Petitioner Holly Marie Patterson is a state prisoner, currently confined at the Huron Valley Women's Complex in Ypsilanti, Michigan.

2.      On January 13, 2009, petitioner was convicted of two counts of extortion, MICH. COMP. LAWS § 750.213; kidnapping, MICH. COMP. LAWS § 750.349; unlawful imprisonment, MICH. COMP. LAWS § 750.349b; and conspiracy to commit extortion, MICH. COMP. LAWS §§ 750.157a, .213, following a jury trial in the Macomb County Circuit Court.  Petitioner was originally sentenced to concurrent terms of life imprisonment on the kidnapping conviction, 10-15 years' imprisonment on the unlawful confinement conviction, and 10½-40 years' imprisonment each on the extortion and conspiracy convictions.

3.      Petitioner appealed as of right to the Michigan Court of Appeals raising, through counsel, the following claims:

I.      REVERSAL AND A NEW TRIAL IS REQUIRED AS A RESULT OF THE COURT'S FAILURE TO EXCUSE BIASED JUROR NO. 32 FOR CAUSE AND/OR BASED ON RELATED INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL FOR NOT EXCUSING THE JUROR WITH A PEREMPTORY CHALLENGE.

II.     REVERSAL AND A NEW TRIAL IS MANDATED HERE BECAUSE OF THE ADMISSION OF TESTIMONY/EVIDENCE FROM TWO (2) POLICE OFFICERS AS TO INCRIMINATING STATEMENTS/ CONFESSIONS (THEY OBTAINED) FROM NON-TESTIFYING CO-DEFENDANT COTOIO INCRIMINATING HOLLY PATTERSON AND SPECIFICALLY IMPLICATING HER IN THE CRIMES CHARGED IN

THIS CASE. SUCH EVIDENCE IS INADMISSIBLE TESTIMONIAL HEARSAY WITHIN THE MEANING OF *CRAWFORD V. WASHINGTON*. THE ADMISSION OF THE OFFICERS' TESTIMONY REGARDING HOLLY PATTERSON BASED ON THE CO-DEFENDANT'S VERBAL AND WRITTEN INCRIMINATING STATEMENTS/CONFESSIONS (WITH THE WRITTEN STATEMENT READ TO THE JURY), VIOLATED HOLLY PATTERSON'S SIXTH AMENDMENT RIGHT TO CONFRONTATION.

III.   DEFENDANT/APPELLANT MUST HAVE HER CONVICTIONS REVERSED AND A NEW TRIAL BASED ON THE INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL. BIG MISTAKES BY TRIAL ATTORNEY (INCLUDING THOSE ADDRESSED IN ARGUMENTS I & II) INDIVIDUALLY AND/OR IN COMBINATION, TRIAL COUNSEL'S ACTS AND/OR HIS FAILURE TO ACT RESULTED IN THE DENIAL TO HOLLY PATTERSON OF EFFECTIVE ASSISTANCE OF COUNSEL, DUE PROCESS AND A MISCARRIAGE OF JUSTICE MANDATING REVERSAL AND NEW TRIAL.

4.   While her appeal was pending, petitioner filed a motion for new trial and resentencing in the trial court. Following two evidentiary hearings the court denied the motion for new trial, but granted the motion for resentencing. On July 1, 2010, she was resentenced to a 10½-40 years' imprisonment on the kidnapping conviction, concurrent to identical terms of imprisonment as previously imposed on the other convictions. Petitioner, through counsel, filed another claim of appeal, raising three claims challenging her newly imposed sentence:

I.   DEFENDANT/APPELLANT PATTERSON MUST BE RESENTENCED (IF HER CONVICTIONS IN THE CASE ARE NOT REVERSED) BASED ON THE MISSCORING OF HER MINIMUM SENTENCE GUIDELINE RANGE (SIR). THE TRIAL COURT COMMITTED ERROR REQUIRING REVERSAL AND MS. PATTERSON WAS DENIED FUNDAMENTAL DUE PROCESS AND A MISCARRIAGE OF JUSTICE RESULTED BY THE IMPROPER SCORING/ADDING OF POINTS UNDER OV 3, OV 7 AND OV 14. RESENTENCING IS MANDATED BECAUSE WITHOUT THE SCORING OR ADDING OF ALL OR SOME OF THESE POINTS HOLLY PATTERSON'S MINIMUM SENTENCE GUIDELINE RANGE (SIR) WOULD BE SUBSTANTIALLY REDUCED/LOWERED (AS WOULD HER MINIMUM SENTENCE.

3

II.  THE SENTENCE (RESENTENCE) IMPOSED IN THIS CASE VIOLATED BOTH THE PROPORTIONALITY RULE OF *PEOPLE V. MILBORN*, AS WELL AS THE EARLIER "SHOCKS THE CONSCIENCE" STANDARD OF *PEOPLE V. COLES*.

III.  MS. PATTERSON MUST BE RESENTENCED WHERE HER SENTENCE GUIDELINES WERE MIS-SCORED (INCORRECTLY SCORED) AND RESULTED IN AN ERROR CAUSING HER MINIMUM SENTENCE TO EXCEED THE CORRECT GUIDELINES RANGE AND RESULTED IN AN ERROR WHICH AFFECTED HER SUBSTANTIAL RIGHTS AND WHERE HER SENTENCE WAS ALSO BASED ON FACTS NEITHER PROVEN TO THE JURY BEYOND A REASONABLE DOUBT NOR ADMITTED BY HER IN VIOLATION OF THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION.

5.  The court of appeals found no merit to petitioner's claims, and affirmed her convictions and sentences.  *See People v. Patterson*, No. 290857, 2011 WL 1902019 (Mich. Ct. App. May 19, 2011) (per curiam).

6.  Petitioner, through counsel, sought leave to appeal these six issues to the Michigan Supreme Court.  The Supreme Court denied petitioner's application for leave to appeal in a standard order.  *See People v. Patterson*, 490 Mich. 969, 806 N.W.2d 506 (2011).

7.  Petitioner, proceeding *pro se*, filed the instant application for a writ of habeas corpus on December 26, 2012.  As grounds for the writ of habeas corpus, she raises the first two claims challenging her resentencing that she raised in the Michigan Court of Appeals, and the first two claims challenging her convictions.

8.  Respondent filed her answer on June 28, 2013.  She contends that petitioner's third and fourth claims, as well as a portion of her second claim, are barred by petitioner's procedural default in the state courts.  Respondent further argues that each of petitioner's claims is without merit.

4

9.     Petitioner filed a reply to respondent's answer on September 9, 2013, and a supplement to her reply on December 10, 2013.

B.     *Factual Background Underlying Petitioner's Conviction*

The evidence adduced at trial was accurately summarized by the Michigan Court of Appeals on petitioner's direct appeal:

> Patterson's convictions arise from an incident in March 2008, during which the victim was forcibly restrained and beaten during an encounter with Patterson and her boyfriend and codefendant Louis Cotoio. The prosecutor's theory at trial was that Patterson and Cotoio "cooked up a plan" to coerce the victim into reimbursing Patterson $500 for the cost of an earlier abortion, because Patterson believed that the victim was responsible for her pregnancy. The prosecutor presented evidence that Patterson invited the victim to her apartment and that, after arriving, the victim was forcibly restrained and beaten by Cotoio. Afterward, Patterson and Cotoio repeatedly screamed at the victim and demanded money. Patterson eventually gave the victim a telephone for him to arrange to have his brother deliver the money in exchange for the victim's release. The victim's brother agreed to bring the money to a specified location, but he also contacted the police. When Patterson arrived at the prearranged location, she was arrested and directed the officer to her nearby Jeep, where the victim was lying bound in the back seat. Cotoio was also inside the Jeep and he too was arrested.

*Patterson*, 2011 WL 1902019, at *1. The evidence was described in more detail in the prosecutor's brief in the Michigan Court of Appeals:

> On March 16, 2008, Matthew Chapman ("Matthew") placed a telephone call to Holly Marie Patterson ("Patterson") between 11:00 p.m. and 12:00 midnight. Matthew had known Patterson since he was 16 or 17 years old. Matthew and Patterson had had an intimate relationship when they were in their early 20s. During the telephone call, Matthew inquired as to how Patterson was doing and they chatted briefly.
>
> Minutes after this telephone conversation ended, Patterson called Matthew. Patterson asked Matthew if he wanted to come over to her apartment. Matthew lived with his parents near a CVS in the area of 13 Mile Road and Schoenherr in Warren. They agreed that Patterson would drive over and pick him up at the CVS. About 10 or 15 minutes later, around 12:00 midnight, Patterson picked up Matthew at the CVS. Patterson, driving a Jeep, was friendly and nothing appeared unusual to Matthew.
>
> Matthew entered Patterson' apartment and, before he realized what was

5

occurring, he was "on the ground handcuffed and duct taped." Matthew had a headache and heard "two people screaming at [him]." He felt "foggy" and "confused." Patterson was standing over him with another man, Louis Cotoio ("Cotoio"), who Matthew did not know. Matthew heard something that sounded like: "[M]ake him eat his words." Matthew responded: "If you guys want money, you're going to have [to] let me go." In response, he "got hit in the face, or kicked in the face, knees in the face."

Matthew's assailants put him on his stomach and cut his jacket and shirt off. Matthew began to kick at them. Patterson got the duct tape and Cotoio duct taped Matthew's feet. As he lay on the floor, Patterson and Cotoio continued to yell at him. They threatened "to dump [him] out in the woods." Matthew began to twist the handcuffs behind his back and, ultimately, was able to break them. He pushed himself and began to hop towards the door as he screamed for help.

Cotoio knocked Matthew back down and put his knee across Matthew's neck. Patterson got a rag doused with rubbing alcohol and "put it over [his] face." Matthew had trouble breathing and, eventually, they removed the rag. Patterson retrieved the duct tape again and Cotoio bound Matthew's hands.

Patterson began to ask for money from Matthew for an abortion. Matthew responded that he "didn't have any money." Patterson replied that "someone better get some money." She asked for a telephone number of somebody to telephone. Matthew gave them the telephone number for his brother, James Chapman ("James").

Near 2:00 a.m., Patterson placed the telephone call to James' home in Royal Oak. Patterson and James had known each other for many years. Patterson immediately put Matthew on the phone, who stated: "Jim, these people want money." Patterson took the telephone away from Matthew's earshot and spoke with James. Patterson told James that if he "wanted to see [his] brother again, that [he] needed to get money." Patterson refused to identify herself to James. During the conversation, James heard her speaking with Cotoio: "How much do you think, babe? Is five hundred good?" Matthew heard Patterson consulting with Cotoio as she spoke to James. Patterson and Cotoio agreed on asking James for $500.00.

Patterson demanded $500.00 from James. In negotiating with Patterson, James endeavored "to stall for time so [he] could have time to contact the police." James told Patterson that he would have to go to an ATM to obtain the money. Patterson instructed James to meet them at a McDonald's at 13 Mile Road and Rochester Road in Royal Oak.

Upon hanging up with Patterson, James called 9-1-1 and "they routed [him] to the Royal Oak dispatch." After informing the dispatcher about his telephone call with Patterson, he told James that he would send some police officers from the Royal Oak Police Department ("ROPD") to meet James at the Woodlawn Church on Rochester Road. The Woodlawn Church is a few blocks north of 13 Mile Road and Rochester Road. James, accompanied by his wife, met ROPD Officer Zachary Nottle ("Officer Nottle"), as well as another ROPD officer, in the church parking lot. As he spoke with the ROPD officers, James received another telephone call from

Patterson. Patterson changed the rendezvous to a Clark gas station in Madison Heights.

After the initial telephone call with James ended, Patterson and Cotoio "got [Matthew] up and into the back end of their Jeep." Matthew was only wearing pants; his cowboy hat and shoes were missing. They duct taped his mouth. Matthew, who was bleeding, could hear an ongoing telephone conversation with James as Patterson drove the Jeep. Matthew heard Patterson talking to James about "[w]here to meet at, changing where the meet was . . . [why it] was taking so long."

James and his wife followed the ROPD officers from the church parking lot towards 12 Mile Road, where he was supposed to meet Patterson. Before reaching the rendezvous location, Officer Nottle got out of the ROPD SUV and climbed into James' vehicle. Officer Nottle crouched in the rear of James' vehicle. At this point, James received another telephone call from Patterson "asking what was taking so long." James made an excuse. Soon, James pulled his vehicle into the Clark gas station.

Patterson exited the Jeep "to go meet [James]." As she did so, Officer Nottle climbed out of James' vehicle and yelled: "[G]et on the ground." Officer Nottle held Patterson on the ground at gunpoint until other ROPD officers descended upon the vehicles. Officer Nottle demanded to know Matthew's location and Patterson "told [him] he was in her Jeep" with her boyfriend. She had parked the Jeep on a nearby side street.

A police officer opened the back of the Jeep and let Matthew out. Officer Nottle viewed Matthew with blood around his mouth, a big lump on his head, and abrasions on his shoulder. The ROPD officers arrested Patterson and Cotoio.

The ROPD officers had notified the Warren Police Department ("WPD") that the "actual abduction took place at [Patterson's] apartment" in Warren. WPD Officer Patrick Moore ("Officer Moore") arrived at the crime scene and seized the handcuffs used by Patterson and Cotoio to bind Matthew's hands.

Emergency medical personnel treated Matthew on the scene. Subsequently, he was transported to the police station to speak with detectives. With Matthew at the police station, James and his wife drove to a local Kmart to purchase clothes for Matthew. Later, James took Matthew to nearby hospital to have his injuries examined. Matthew stayed at the hospital for three days.

WPD Detective Mark Christian ("Detective Christian") interviewed Cotoio at the police station. Detective Christian also spoke with Patterson. He read the *Miranda* warnings to her. Patterson waived these rights and agreed to talk to Detective Christian. Patterson claimed that Matthew had telephoned her that evening and, a short time later, simply shown up at her apartment. When Detective Christian confronted her with Matthew's account and mentioned that CVS had surveillance cameras in its parking lot, Patterson conceded that she had picked him up at CVS.

Patterson told Detective Christian that she was alone in the apartment when Matthew arrived. According to her, they began to argue about paying for Patterson's abortion. At that point, Cotoio "just showed up" and "things got crazy." Patterson stated that Matthew attacked her, pulling her hair and grabbing her. As a result,

7

Patterson indicated to Detective Christian, Matthew had "to be put in control." Patterson had no visible injuries and "appeared to have freshly manicured nails."

Pl.-Appellee's Br. on Appeal, in *People v. Patterson*, No. 290857 (Mich. Ct. App.), at 1-7 (citations to trial transcript omitted).

C.    *Procedural Default*

Respondent contends that the portion of petitioner's second claim asserting that she was punished at sentencing for refusing to admit guilt, as well as her third and fourth claims, are barred by petitioner's procedural default in the state courts. Although petitioner's claims are likely defaulted, the Court should nevertheless address the merits of the claims.

Under the procedural default doctrine, a federal habeas court will not review a question of federal law if the state court's decision rests on a substantive or procedural state law ground that is independent of the federal question and is adequate to support the judgment. *See Coleman v. Thompson*, 501 U.S. 722, 729 (1991). However, with respect to each potentially defaulted claim, petitioner contends that counsel was ineffective for failing to raise the proper objection. If petitioner's position is correct, counsel's ineffectiveness may constitute cause to excuse any procedural default. *See Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Consideration of counsel's effectiveness, however, depends in part on consideration of petitioner's underlying claims. Given that the cause and prejudice inquiry merges with an analysis of the merits of petitioner's defaulted claims, it is better to simply consider the merits of these claims, even if they are defaulted. *See Jamison v. Collins*, 100 F. Supp. 2d 647, 676 (S.D. Ohio 2000); *Watkins v. Miller*, 92 F. Supp. 2d 824, 832 (S.D. Ind. 2000); *cf. Strickler v. Greene*, 527 U.S. 263, 282 (1999) (considering merits of petitioner's habeas claims where inquiry into the merits mirrored cause and prejudice inquiry).

8

D.     *Standard of Review*

Because petitioner's application was filed after April 24, 1996, his petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996).  *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997). Amongst other amendments, the AEDPA amended the substantive standards for granting habeas relief by providing:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning." *Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also*, *Bell v. Cone*, 535 U.S. 685, 694 (2002).  "A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams*, 529 U.S. at 405-06); *see also*, *Early v. Packer*, 537 U.S. 3, 8 (2002); *Bell*, 535 U.S. at 694.  "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*,

539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also*, *Bell*, 535 U.S. at 694. However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also*, *Williams*, 529 U.S. at 409. As the Supreme Court has explained, the standard for relief under § 2254(d) "is difficult to meet, [and] that is because it was meant to be." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011). As the Court explained, "[s]ection 2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice system,' not a substitute for ordinary error correction through appeal." *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring in the judgment)). Thus, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 786-87.

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court." Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." *Williams*, 529 U.S. at 412. Further, the "phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.' In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529

U.S. at 412).  The relevant "clearly established law" is the law that existed at the time of the last state court decision to issue a reasoned decision on the claim, *see Greene v. Fisher*, 132 S. Ct. 38, 44-45 (2011), and in evaluating the reasonableness of that decision a federal habeas court is limited to the record that was before the state court at the time of its decision, *see Cullen v. Pinholster*, 131 S. Ct. 1388, 1398-99 (2011).

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them."  *Early*, 537 U.S. at 8; *see also*, *Mitchell*, 540 U.S. at 16.  Further, although the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue.  *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Phoenix v. Matesanz*, 233 F.3d 77, 83 n.3 (1st Cir. 2000); *Dickens v. Jones*, 203 F. Supp. 2d 354, 359 (E.D. Mich. 2002) (Tarnow, J.).

As noted above, several of petitioner's claims may be procedurally defaulted.  With respect to each claim, however, the Michigan Court of Appeals addressed the underlying merits, either in the alternative or as part of a plain error analysis.  The Sixth Circuit has "squarely endorsed the view that 'a federal constitutional claim reviewed by a state court for "plain error" can be considered "adjudicated on the merits" for the purpose of receiving deference under AEDPA.'"  *Bond v. McQuiggan*, 506 Fed. Appx. 493, 498 n.2 (6th Cir. Nov. 29, 2012) (quoting *Fleming v. Metrish*, 556 F.3d 520, 532 (6th Cir. 2009)).  Further, where a state court addresses the merits as an alternative

ground for decision notwithstanding its application of a procedural bar, the alternative merits adjudication is considered "on the merits" for purposes of § 2254(d) and is entitled to deference under the AEDPA. *See Brooks v. Bagley*, 513 F.3d 618, 624-25 (6th Cir. 2008); *see also*, *Rolan v. Coleman*, 680 F.3d 311, 319-20 (3d Cir. 2012) (citing cases). Thus, the AEDPA standard of review set forth in § 2254(d) applies to petitioner's arguably defaulted claims.

E.       *Sentencing (Claims I & II)*

Petitioner first raises several challenges to her sentence. Specifically, she contends that the trial court improperly scored several offense variables in computing the guidelines, engaged in judicial factfinding in violation of the Sixth Amendment, and sentenced her to a disproportionate term of imprisonment. The Court should conclude that petitioner is not entitled to habeas relief on these claims.

1.       *Guidelines Scoring (Claim I)*

With respect to the scoring of the guidelines, petitioner's claim is not cognizable on habeas review. A habeas petitioner's claim that the trial court violated state law when sentencing him is not cognizable in habeas corpus proceedings. *See Branan v. Booth*, 861 F.2d 1507, 1508 (11th Cir. 1988); *Haynes v. Butler*, 825 F.2d 921, 924 (5th Cir. 1987). Federal habeas courts have no authority to interfere with perceived errors in state law unless the petitioner is denied fundamental fairness in the trial process. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Serra v. Michigan Department of Corrections*, 4 F.3d 1348, 1354 (6th Cir. 1993). Petitioner's claim that the court improperly scored or departed from the guidelines range raises issues of state law that are not cognizable on habeas review. *See Cook v. Stegall*, 56 F. Supp. 2d 788, 797 (E.D. Mich. 1999) (Gadola, J.) (claim that sentencing court departed from Michigan sentencing guidelines presents an

12

issue of state law only and is, thus, not cognizable in federal habeas review); *Welch v. Burke*, 49 F. Supp. 2d 992, 1009 (E.D. Mich. 1999) (Cleland, J.) (same); *see also, Branan*, 851 F.2d at 1508 (claim that court misapplied state sentencing guidelines not cognizable on habeas review). Thus, petitioner is not entitled to habeas relief on her claims relating to the trial court's scoring of, or departure from, the Michigan sentencing guidelines.

2.      *Judicial Factfinding (Claim I)*

Petitioner also argues that the trial court engaged in improper factfinding at sentencing, in violation of *Blakely v. Washington*, 542 U.S. 296 (2004) and *Apprendi v. New Jersey*, 530 U.S. 466 (2000). In *Apprendi*, the Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490. In *Blakely*, the Court considered the applicability of *Apprendi* to a state sentencing guidelines scheme similar to the United States Sentencing Guidelines. The state in that case argued that guidelines findings were not prohibited by *Apprendi* because *Apprendi* prohibited only factual findings at sentencing which increased the statutory maximum penalty to which the defendant was exposed. The Court in *Blakely* rejected this argument and struck down the state guidelines scheme, explaining that:

> the "statutory maximum" for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.* In other words, the relevant "statutory maximum" is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings. When a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts "which the law makes essential to the punishment," and the judge exceeds his proper authority.

*Blakely*, 542 U.S. at 303-04 (citations omitted) (emphasis in original). Finally, in *United States v. Booker*, 543 U.S. 220 (2005), the Court took the step logically suggested by *Blakely*, concluding that

13

the United States Sentencing Guidelines are unconstitutional under *Apprendi* because they allow federal judges to impose sentences based on facts not found by a jury beyond a reasonable doubt. *See Booker*, 543 U.S. at 233, 237-43.

*Blakely* and *Apprendi*, however, are inapplicable here.  Michigan law provides for an indeterminate sentencing scheme, unlike the determinate sentencing schemes at issue in *Blakely* and *Booker*.  Under Michigan law the defendant is given a sentence with a minimum and a maximum sentence.  The maximum sentence is not determined by the trial judge but is set by law.  *See People v. Drohan,* 475 Mich. 140, 160-61, 715 N.W.2d 778, 789-90 (2006); *People v. Claypool,* 470 Mich. 715, 730 n.14, 684 N.W.2d 278, 286 n.14 (2004); Mich. Comp. Laws § 769.8.  "[M]ichigan's sentencing guidelines, unlike the Washington guidelines at issue in *Blakely*, create a range within which the trial court must set the minimum sentence." *Drohan,* 475 Mich. at 161, 715 N.W.2d at 790.  Under Michigan law, only the minimum sentence must presumptively be set within the appropriate sentencing guidelines range. *See People v. Babcock,* 469 Mich. 247, 255 n.7, 666 N.W.2d 231, 236 n.7 (2003) (discussing Mich. Comp. Laws § 769.34(2)).  Under Michigan law, the trial judge sets the minimum sentence, but can never exceed the maximum sentence. *See Claypool,* 470 Mich. at 730 n.14, 684 N.W.2d at 286 n.14.

*Blakely* is inapplicable here because *Blakely* is concerned only with the *maximum* penalty which is authorized by a jury's findings or a defendant's plea: if some additional factor increases the defendant's penalty beyond that which could be imposed solely on the basis of the jury's findings or the defendant's plea, *Blakely* requires that those facts be found by a jury beyond a reasonable doubt (or be themselves pleaded to by a defendant).  As explained above, unlike the guidelines scheme at issue in *Blakely*, the Michigan sentence guidelines help determine only the

14

minimum portion of a defendant's indeterminate sentence.  The maximum is, in every case, the statutory maximum authorized by law.  *See Claypool*, 470 Mich. at 730 n.14, 684 N.W.2d at 286 n.14; MICH. COMP. LAWS § 769.8. Petitioner's conviction on the armed robbery charge, therefore, contained all of the factual findings necessary to impose the statutory maximum (life imprisonment) on that charge.  *See Drohan*, 475 Mich. at 162, 715 N.W.2d at 790 ("Thus, the trial court's power to impose a sentence is always derived from the jury's verdict, because the 'maximum-minimum' sentence will always fall within the range authorized by the jury's verdict.").

This being the case, petitioner's sentence did not violate *Blakely*.  The Supreme Court has repeatedly made clear that the *Apprendi* rule is concerned only with the maximum sentence which is authorized by a jury's verdict or a defendant's plea.  As the Supreme Court explained in *Harris v. United States*, 536 U.S. 545 (2002):

> *Apprendi* said that any fact extending the defendant's sentence beyond the maximum authorized by the jury's verdict would have been considered an element of an aggravated crime–and thus the domain of the jury–by those who framed the Bill of Rights.  The same cannot be said of a fact increasing the mandatory minimum (but not extending the sentence beyond the statutory maximum), for the jury's verdict authorized the judge to impose the minimum with or without the finding.

*Harris*, 536 U.S. at 557.  This distinction is important because the only issue under the Sixth Amendment is whether the judge is impinging on the role of the jury.  For this reason, the Court explicitly excepted indeterminate sentencing schemes such as Michigan's from its holding in *Blakely*.  Rejecting an argument raised by Justice O'Connor in dissent, the Court explained:

> Justice O'Connor argues that, because determinate sentencing schemes involving judicial factfinding entail less judicial discretion than indeterminate schemes, the constitutionality of the latter implies the constitutionality of the former.  This argument is flawed on a number of levels.  First, the Sixth Amendment by its terms is not a limitation on judicial power, but a reservation of jury power.  It limits judicial power only to the extent that the claimed judicial power infringes on the province of the jury.  Indeterminate sentencing does not do so.  It increases judicial

15

discretion, to be sure, but not at the expense of the jury's traditional function of finding the facts essential to lawful imposition of the penalty. Of course indeterminate schemes involve judicial factfinding, in that a judge (like a parole board) may implicitly rule on those facts he deems important to the exercise of his sentencing discretion. But the facts do not pertain to whether the defendant has a legal *right* to a lesser sentence–and that makes all the difference insofar as judicial impingement upon the traditional role of the jury is concerned.

*Blakely*, 542 U.S. at 309 (citation omitted). Under this reasoning, it is clear that Michigan's indeterminate sentencing guideline scheme, under which the maximum is established by statute and only the minimum term is based on judicial factfinding, does not violate the Sixth Amendment, as both the Sixth Circuit and the Michigan Supreme Court have repeatedly held. *See Montes v. Trombley*, 599 F.3d 490, 496-97 (6th Cir. 2010); *Chontos v. Berghuis*, 585 F.3d 1000, 1002 (6th Cir. 2009); *Drohan,* 475 Mich. at 164, 715 N.W.2d at 791-92; *Claypool*, 470 Mich. at 730 n.14, 684 N.W.2d at 286 n.14.

This conclusion is not altered by the Supreme Court's more recent decision in *Alleyne v. United States*, 133 S. Ct. 2151 (2013). In that case, the Court overruled *Harris*, and extended *Apprendi* to facts that increase a mandatory minimum sentence. Reasoning that the *Harris* Court's distinction between facts that increase the statutory maximum and facts that increase a mandatory minimum is inconsistent with *Apprendi*, the Court in *Alleyne* held that "[a]ny fact that, by law, increases the penalty for a crime is an 'element' that must be submitted to the jury and found beyond a reasonable doubt. Mandatory minimum sentences increase the penalty for a crime. It follows, then, that any fact that increases the mandatory minimum is an 'element' that must be submitted to the jury." *Alleyne*, 133 S. Ct. at 2155 (citation omitted). The Court was careful to note, however, that its ruling "does not mean that any fact that influences judicial discretion must be found by a jury." *Id*. at 2163. Judges retain broad discretion to impose any sentence within the range

16

authorized by law based on the jury's findings (or the facts admitted in a plea), and may judicially

find facts in exercising this discretion. *See id.*

 *Alleyne* is inapplicable here. *Alleyne* dealt with statutory mandatory minimum sentences,

as opposed to facts used to determine the minimum sentence of an indeterminate sentencing scheme

such as Michigan's. Therefore, "[i]t is questionable whether *Alleyne* applies to Michigan's

sentencing scheme." *Spears v. Curtin*, No. 1:13-cv-1013, 2013 WL 5636625, at *6 (W.D. Mich.

Oct. 16, 2013). More importantly, even if *Alleyne* now bars judicial factfinding under the Michigan

sentencing scheme, it does not constitute "clearly established federal law" under § 2254(d)(1) for

purposes of petitioner's claim. At the time the Michigan Court of Appeals rejected petitioner's

*Apprendi* claim, *Alleyne* had not been decided and the Court's decision in *Harris* made clear that

the Michigan Court of Appeals's rejection of petitioner's claim was proper. The rule of *Alleyne* was

not clearly established at the time the state courts rejected petitioner's claim, and thus it provides

no basis for habeas relief under § 2254(d)(1). *See Kittka v. Franks*, 539 Fed. Appx. 668, 672 (6th

Cir. 2013); *Williams v. Smith*, No. 11-15163, 2014 WL 632437, at *7 (E.D. Mich. Feb. 18, 2014)

(Lawson, J., adopting report and recommendation of Komives, M.J.); *Stockman v. Berghuis*, No.

2:10-CV-14860, 2013 WL 6885121, at *14 (E.D. Mich. Dec. 31, 2013). Accordingly, the Court

should conclude that petitioner is not entitled to habeas relief on this claim.

  3. *Proportionality (Claim II)*

 Finally, petitioner contends that her sentence was disproportionate to her offense. The Court

should conclude that petitioner is not entitled to habeas relief on this claim.

   *a. Clearly Established Law*

 To the extent that petitioner relies on the Michigan proportionality rule established in *People*

*v. Milbourn*, 435 Mich. 630, 461 N.W.2d 1 (1990), her claim is solely one of state law which is not cognizable on federal habeas review. *See Welch v. Burke*, 49 F. Supp. 2d 992, 1009 (E.D. Mich. 1999) (Cleland, J.). Thus, the only question here is whether petitioner's sentence violates the Eighth Amendment. In *Solem v. Helm*, 463 U.S. 277 (1983), the Supreme Court held that the Eighth Amendment requires that "a criminal sentence must be proportionate to the crime for which the defendant has been convicted." *Id*. at 290. In considering whether a sentence is proportionate, the Court identified three objective factors which are relevant: "(I) the gravity of the offense and the harshness of the penalty; (ii) the sentences imposed on other criminals in the same jurisdiction; and (iii) the sentences imposed for the same crime in other jurisdictions." *Id*. at 292. Applying this test to the facts before it, the Court found that the defendant's sentence of life imprisonment without possibility of parole under a habitual offender statute was disproportionate where the three underlying felonies were nonviolent crimes involving small sums of money, the final felony being for uttering a false check. *See id*. at 303.

However, the reach of *Solem* has been limited by the Supreme Court's more recent decision in *Harmelin v. Michigan*, 501 U.S. 957 (1991). In *Harmelin*, the Court held that Michigan's mandatory sentence of life imprisonment for possession of over 650 grams of a controlled substance did not violate the Eighth Amendment. Justice Scalia, joined by Chief Justice Rehnquist, reasoned that *Solem* was wrongly decided and should be overruled, and concluded that the Eighth Amendment contains no proportionality requirement outside the capital punishment context. *See Harmelin*, 501 U.S. at 965 (Scalia, J.). Justice Kennedy, joined by Justices O'Connor and Souter, concluded that the Eighth Amendment contains a very narrow proportionality principle, which prohibits only those punishments which are "grossly" disproportionate to the crime. *See id*. at 1001 (Kennedy, J.).

18

Further, Justice Kennedy's opinion distinguished *Solem*, essentially limiting application of the *Solem* objective criteria test to the facts in that case. *See id*. at 1001-05. Specifically, Justice Kennedy concluded that the objective analysis required in *Solem* is "appropriate only in the rare case in which a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality." *Id*. at 1005.[1] Thus, it is unclear whether, and to what extent, *Solem* remains good law. *See McGruder v. Puckett*, 954 F.2d 313, 316 (5th Cir. 1992) ("By applying a head-count analysis, we find that seven members of the Court supported a continued Eighth Amendment guaranty against disproportional sentences. Only four justices, however, supported the continued application of all three factors in *Solem*, and five justices rejected it. Thus, this much is clear: disproportionality survives; *Solem* does not.").

> As the Sixth Circuit has summarized,
>
> although only two Justices [Rehnquist and Scalia] would have held that the eighth amendment has no proportionality requirement, five Justices [Kennedy, O'Connor, and Souter, along with Rehnquist and Scalia] agree that there is no requirement of strict proportionality.

*United States v. Hopper*, 941 F.2d 419, 422 (6th Cir. 1991). At most, then, the Eighth Amendment "forbids only extreme sentences that are 'grossly disproportionate' to the crime." *Harmelin*, 501 U.S. at 1001; *Hopper*, 941 F.2d at 422 ("the eighth amendment is offended only by an extreme disparity between crime and sentence"). Thus, as a general matter,

> one could argue without fear of contradiction by any decision of [the Supreme] Court that for crimes concededly classified and classifiable as felonies, that is, as punishable by significant terms of imprisonment in a state penitentiary, the length of sentence actually imposed is purely a matter of legislative prerogative.

---

[1]Justices White, Blackmun, Stevens, and Marshall all concluded that *Solem* should be upheld, and the three-factor test applied to the sentencing scheme at issue. *See Harmelin*, 501 U.S. at 1016 (White, J., dissenting).

*Rummel v. Estelle*, 445 U.S. 263, 274 (1980); *see Harmelin*, 501 U.S. at 962-65 (Scalia, J.); *id.* at 997-1001 (Kennedy, J.).

More recently, the Supreme Court again considered the proportionality issue under the Eighth Amendment, resulting in a split similar to that reached in *Harmelin*. In *Ewing v. California*, 538 U.S. 11 (2003), a three-justice plurality reaffirmed Justice Kennedy's approach in *Harmelin*, concluding that the Eighth Amendment contains a narrow proportionality principle which forbids sentences which are grossly disproportionate to the offense. *See id.* at 23-24 (opinion of O'Connor, J.). Justice O'Connor was joined in this position by Justice Kennedy, who had authored the plurality opinion in *Harmelin*, and by Chief Justice Rehnquist, who in *Harmelin* had joined Justice Scalia in concluding that the Eighth Amendment contains no proportionality requirement outside of the capital sentencing context. Justice Scalia, now joined by Justice Thomas (who was not on the Court when *Harmelin* was decided), reaffirmed his view that the Eighth Amendment contains no proportionality guaranty. *See id.* at 31-32 (opinion of Scalia, J.); *id.* at 32 (opinion of Thomas, J.). Justice Stevens likewise reaffirmed his view from *Harmelin* that the three-factor test of *Solem* guides the proportionality inquiry under the Eighth Amendment. Justice Stevens was joined in this view by Justice Souter, who had joined the plurality opinion of Justice Kennedy in *Harmelin*, as well as by Justices Ginsburg and Breyer, who were not on the Court when *Harmelin* was decided. *See id.* at 33-35 (opinion of Stevens, J.); *id.* at 35-37 (opinion of Breyer, J.).

Thus, although the particular Justices attached to each position have changed somewhat, the numbers and rationales in *Ewing* break down precisely as they did in *Harmelin*. Thus, for purposes of habeas review, the Sixth Circuit's analysis of *Harmelin*, in which this Court asks only whether the sentence is grossly disproportionate to the offense, *see Coleman v. DeWitt*, 282 F.3d 908, 915

(6th Cir. 2002); *United States v. Baker*, 197 F.3d 211, 217 (6th Cir. 1999), remains controlling under *Ewing*.

### b. Analysis

Here, the *Harmelin* plurality's "threshold comparison" of petitioner's crime and the sentence imposed , does not "lead[] to an inference of gross disproportionality," *Harmelin*, 501 U.S. at 1005, and thus the Court should conclude that petitioner is not entitled to habeas relief on this ground. Petitioner was convicted of kidnapping and other crimes in a scheme involving the unlawful confinement and brutal assault of the victim in order to extort money from him.  Given the nature of the offense, petitioner's sentence of 10½-40 years' imprisonment, well below the statutory maximum of life imprisonment, is not grossly disproportionate to her offense.  *See United States v. Angeles*, 484 Fed. Appx. 27, 36 (6th Cir. 2012) (upholding life sentence for kidnapping involving torture); *Eckert v. Tansy*, 936 F.2d 444, 448-49 (9th Cir. 1991) (upholding consecutive life sentences imposed for two convictions of first degree kidnapping); *Driver v. Trimble*, No. C 10-2564, 2011 WL 5837915, at *16 (N.D. Cal. Nov. 21, 2011) (upholding sentence of 35 years to life for petitioner's kidnapping and assault of his wife).  Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

4.   *Sentence Based on Failure to Admit Guilt (Claim II)*

As part of Claim II, petitioner also suggests that her sentence was impermissibly based on her failure to admit guilt.  The Court should conclude that petitioner is not entitled to habeas relief on this claim.

### a. Clearly Established Law

It is well-established that "[a]n accused may not be subjected to more severe punishment for

exercising his constitutional right to stand trial [or appeal]." *United States v. Carter*, 804 F.2d 508, 513 (9th Cir. 1986); *accord Waring v. Delo*, 7 F.3d 753, 758 (9th Cir. 1993).  Where a harsher sentence is imposed following a successful appeal, the sentence is presumed to be vindictive and the record must affirmatively demonstrate that the sentence was not imposed for an impermissible reason.  *See North Carolina v. Pearce*, 395 U.S. 711, 724 (1969).  Where, however, the sentence imposed after trial is more harsh than one imposed in conjunction with an earlier plea agreement (or as here one in a proposed plea agreement), no such presumption arises.  *See Alabama v. Smith*, 490 U.S. 794, 799 (1989).  Accordingly, petitioner "bears the burden of proving that actual judicial vindictiveness motivated the . . . sentence [s]he received after trial." *Waring*, 7 F.3d at 758; *see also*, *Pabon v. Hake*, 763 F. Supp. 1189, 1194 (E.D.N.Y. 1991).

*b. Analysis*

Petitioner's vindictive sentence claim is based solely on the fact that Cotoio, who she claims was more culpable, received a sentence of only five years' imprisonment, while she received a much harsher sentence.  The Michigan Court of Appeals rejected petitioner's claim, concluding that "[t]he record does not support Patterson's claim that the trial court improperly punished her for failing to admit her guilt." *Patterson*, 2011 WL 1902019, at *6.  This determination was reasonable.  The Michigan Court of Appeals determined that petitioner's sentence was correctly scored under the sentencing guidelines as a matter of state law, and that petitioner's sentence fell within the guidelines.  Because Cotoio pleaded guilty pursuant to a plea agreement which capped his minimum sentence, his guidelines scoring could not be compared to the guidelines scoring for petitioner.  As the court of appeals noted, petitioner was offered, but rejected, the same deal that Cotoio accepted.  The mere fact that petitioner was sentenced more harshly than Cotoio or than she would have been

22

under the offered plea deal is insufficient, by itself, to show that her sentence was improper.  As the

First Circuit has explained in substantially similar circumstances:

> [T]he mere fact that the post-verdict sentence exceeds the 'plea bargain' sentence . . is insufficient, in and of itself, to indicate a reasonable likelihood of vindictiveness. For one thing, unlike a verdict of guilty, an admission of guilt properly warrants the sentencing court's consideration of a more lenient sentence than might otherwise be imposed in an appropriate response to the defendant's criminal conduct.  *See Smith*, 490 U.S. at 802.  Thus, the . . . sentence proffered to [petitioner] during the plea bargaining process does not reflect a true assessment of [petitioner]'s criminal culpability, in that it plainly included a substantial discount for leniency.
>
> As for the remaining aspect of the differential, normally the sentencing court imposes a post-verdict sentence after considering the evidence presented at trial.  In contrast, a plea-bargained sentence normally is predicated upon a more rudimentary record of the alleged criminal conduct, such as the description in the indictment, and/or a presentence report.  *See id*. at 801.  Indeed, the sentencing judge in this case adverted to this very consideration in sentencing [petitioner].

*Correia v. Hall*, 364 F.3d 385, 388-89 (1st Cir. 2004) (parallel citations omitted); *see also*, *Williams v. Jones*, 231 F. Supp. 2d 586, 598-99 (E.D. Mich. 2002) (Lawson, J.).  Further, in sentencing petitioner the "judge made no comment whatsoever which might even remotely imply that he intended to impose a harsher sentence in the event [petitioner] did not accept" the plea deal. *Correia*, 364 F.3d at 391.

In short, the record contains nothing to give rise to a presumption of vindictiveness and beyond the fact of a harsher sentence–which alone is insufficient–"petitioner offered no evidence of actual vindictiveness."  *Williams*, 231 F. Supp. 2d at 599.  Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

F.      *Biased Juror (Claim III)*

Petitioner next contends that a biased juror was allowed to be seated at her trial.  The Court should conclude that petitioner is not entitled to habeas relief on this claim.

1.      *Clearly Established Law*

The Sixth Amendment commands that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury." U.S. CONST. amend VI. This provision guarantees the right to a trial by an impartial jury. *See Duncan v. Louisiana*, 391 U.S. 145, 147-149 (1968). The constitutional standard of fairness requires that a defendant in a criminal case have a panel of impartial, "indifferent" jurors. *See Morgan v. Illinois*, 504 U.S. 719, 726 (1992); *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). "*Voir dire* protects this right by exposing possible biases, both known and unknown, on the part of potential jurors." *United States v. Perkins*, 748 F.2d 1519, 1531 (11th Cir. 1984) (internal quotations omitted). A perfectly uninformed jury is not required; all that is required is "a jury capable and willing to decide the case solely on the evidence before it." *Smith v. Phillips*, 455 U.S. 209, 217 (1982). A habeas court's review of a state court's determination of jury impartiality is highly deferential. *See Lucero v. Kirby*, 133 F.3d 1299, 1308 (10th Cir. 1998) (discussing *Mu'Min v. Virginia*, 500 U.S. 415, 422-28 (1991)); *Daniels v. Burke*, 83 F.3d 760, 766 (6th Cir. 1996). A finding of jury impartiality is a factual determination, and is therefore presumed correct on habeas review unless a petitioner presents clear and convincing evidence to the contrary. *See Gall v. Parker*, 231 F.3d 265, 309 (6th Cir. 2000).

2.    *Analysis*

Here, petitioner contends that Juror 32 was biased because of her views on abortion. During *voir dire*, both the prosecutor and defense counsel questioned the venire members on their views of abortion, as the evidence would show that petitioner had previously had an abortion and obtaining money for an abortion was a possible motive for the crime. Juror 32 indicated that she was against abortion. *See* Trial Tr., Vol. I, at 43-44. The following exchange later occurred between Juror 32 and defense counsel:

24

MR. SHEIKH:            . . . .  Those of you particularly that against it, is that something that you're going to hold like a litmus test and you need to hear nothing lese and such a sin in your life, no matter what else happens, you're not going to be able to forgive her?
                            Let me ask you, juror number 32, would that be your position?

JUROR NO. 32:         Yes.

MR. SHEIKH:            So there's nothing – no need to go any further; is that correct?

JUROR NO. 32:         No.

*Id.* at 45.  Subsequently, the trial court attempted to clarify the position of Juror 32 and another juror,

leading to the following exchange:

THE COURT:            Let me clarify something.  He's stating that you're going to hear in this case as background to what is alleged to have happened as history between the parties, that the defendant got an abortion.  He's not telling you this for salacious reasons, for gossipy reasons.  It's background in the case between the complaining witness, the alleged victim, and the defendant.  You're going to hear she got an abortion.  I think you're going to hear that she believed it was his child and that led to further discussions.  Okay.  Now, she's either right to have done that [or] wrong to have done that.  She may answer for it later on.  What we can't have here is, she did that?  Then she's guilty of any and anything without hearing another word that she may have done three months, six months, nine months later.  Does anybody actually think that?
                            Juror number 32, are you taking that position?

JUROR NO. 32:         I just – it's something that's going to be on my mind, in the back of my mind.  I just don't want that to be, you know, affecting whatever.  It is going to be in my mind.  I'm uncomfortable with it.

THE COURT:            It's okay for it to be in your mind, but, you know, there's 350 or so million people in the country you don't have to like.  We run into people we don't like what they've done or don't agree with what choices they've made.  She's not on trial for that.  She's on trial for: Did she kidnap, extort, conspire to extort, et cetera.  Did she do that or not?  That's all we care

about here in terms of end result.  Can you judge her fairly on those allegations?

JUROR NO. 32:          I can try.

*Id*. at 48-49.  Defense counsel then moved to remove Juror 32 for cause, leading to another exchange on the matter:

MR. SHEIKH:            For cause.  Juror 32 has indicated she would [not be] able to isolate anything having to do with abortion with whatever actions which may or may not be attributable to my client.

                             * * * *

THE COURT:             Well, let me say this: That's not a rational position to take. I don't think ultimately either of the jurors questioned took that position.  It is entirely rational that it's your opinion to say I do not like abortion; I do not approve of it.  I think it's one of the worst things possible and I'm not happy with anyone who did it.  That's fine, if that's your position.  To then translate that into, and if you've done that, you're no good on anything else and I'm ready to vote you down on any other proposition subsequent to that.  That's not a rational position.  Juror number 32, I don't take that to be your position.

JUROR NO. 32:          No.

THE COURT:             I take it to be: I can't unring a bell, however, I'm ready to follow the instructions and judge you fairly as I would try to judge any person fairly.

JUROR NO. 32:          I will try, your Honor.

*Id*. at 53-54.  Based on this exchange, the trial court denied counsel's challenge for cause.  *See id*. at 55.

Although Juror 32 expressed some hesitation, she ultimately indicated that her position was not that petitioner was guilty of the charged crimes simply because she had had an abortion, and that she would try to follow the instructions and judge petitioner fairly.  The Court presumes that these

26

statements were truthful, and petitioner has pointed to nothing to call into question the sincerity of the jurors' assurances. *See Patton v. Yount*, 467 U.S. 1025, 1036 (1984) (question in case of juror bias is whether juror swore "that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestation of impartiality have been believed."); *Howard v. Davis*, 815 F.2d 1429, 1431 (11th Cir. 1987) (habeas relief not warranted on petitioner's claim of juror bias where juror stated he could be impartial despite his relationship with the victim). Beyond the transcript itself, petitioner has pointed to no evidence that Juror 32 was ultimately biased against her. Because this Court's review of the trial court's impartiality finding is highly deferential, and because petitioner has presented no clear and convincing evidence to contradict the trial court's finding, petitioner is not entitled to habeas relief on this claim.

G.     *Confrontation Clause (Claim IV)*

Petitioner next claims that she was denied the right to confront the witnesses against her when the prosecution introduced inculpatory statements made by Cotoio, her nontestifying codefendant. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

The Court need not delve into the merits of this claim, because it is barred by the invited error doctrine. As the name implies, under this doctrine "[a] defendant in a criminal case cannot complain of error which he himself has invited." *Shields v. United States*, 273 U.S. 583, 586 (1927) (internal quotation omitted); *see also, Reed v. Ross*, 468 U.S. 1, 14 (1984) (counsel "may not use the prospect of federal habeas corpus relief as a hedge against the strategic risks he takes in his client's defense in state court."). Here, it is clear that petitioner did not object to the alleged confrontation violation as a deliberate matter of trial strategy. As explained by the Michigan Court of Appeals:

27

> The record indicates that defense counsel deliberately declined to object to the testimony regarding Cotoio's police statements as a matter of trial strategy. The defense theory at trial was that Cotoio was alone responsible for the charged crimes and that Patterson was merely present. At the Ginther hearing, defense counsel explained that his strategy was to mitigate Patterson's involvement and to show that there was no plan between Patterson and Cotoio. Counsel stated that wanted to call Cotoio as a witness at trial, but was unable to do so because Cotoio invoked his Fifth Amendment privilege. Counsel wanted the jury to hear Cotoio's police statements, which described his involvement in the charged offenses. Patterson likewise stated that she wanted Cotoio to testify so that he could tell the truth and further indicated that she had seen Cotoio's written statement, which she claimed was truthful. The record indicates that Cotoio's police statements were viewed by both Patterson and her attorney as supportive of the defense theory, and as containing substantive facts that Patterson wanted the jury to hear.

*Patterson*, 2011 WL 1902019, at *3.

Thus, counsel and petitioner did not simply fail to object (which would constitute a procedural default), but rather invited the error by actively acquiescing in the admission of Cotoio's statements as a deliberate trial strategy. It is well established that Confrontation Clause rights, like most other constitutional rights, may be waived. *See, e.g.*, *Melendez–Diaz v. Massachusetts*, 557 U.S. 305, 314 n.3 (2009) ("The right to confrontation may, of course, be waived, including by failure to object to the offending evidence ..."); *United States v. Gamba*, 541 F.3d 895, 900 (9th Cir. 2008) (counsel may deliberately and as a result of trial tactics and strategy waive the accused's Sixth Amendment right to cross-examination and confrontation). In particular, the courts have held that confrontation claims, including those involving the admission of a non-testifying codefendant's statements, are subject to the invited error doctrine. *See United States v. Arriola-Perez*, 137 Fed. Appx. 119, 132-33 (10th Cir. 2005) (citing cases); *United States v. Jerrigan*, 341 F.3d 1273, 1289-90 (11th Cir. 2003). By actively supporting the introduction of Cotoio's statements in order to help her defense, petitioner invited any confrontation error. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

28

H.    *Ineffective Assistance of Counsel (Claims III & IV)*

Petitioner next contends that counsel was ineffective for failing to ensure the removal of Juror 32, and for failing to object to the Confrontation Clause violation. The Court should conclude that petitioner is not entitled to habeas relief on these claims.

1.    *Clearly Established Law*

The Sixth Amendment right to counsel and the right to effective assistance of counsel protect the fundamental right to a fair trial. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). To establish the ineffective assistance of counsel, petitioner must show that: (1) counsel's errors were so serious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment;" and (2) counsel's deficient performance prejudiced the defense. *Id*. at 687. These two components are mixed questions of law and fact. *Id*. at 698. Further, "[t]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697. If "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Id.* With respect to the performance prong of the *Strickland* test, a strong presumption exists that counsel's behavior lies within the wide range of reasonable professional assistance. *See id*. at 689; *see also O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994). "[D]efendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (citation omitted). "[T]he court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id*. at 690. With respect to the prejudice prong, the reviewing court must determine, based on the totality of the evidence before

29

the factfinder, "whether there is a reasonable probability that, absent the errors, the factfinder would

have had a reasonable doubt respecting guilt." *Id*. at 695.  It is petitioner's burden to establish the

elements of his ineffective assistance of counsel claim.  *See United States v. Pierce*, 63 F.3d 818,

833 (6th Cir. 1995) (petitioner bears the burden of establishing counsel's ineffectiveness); *Lewis v.*

*Alexander*, 11 F.3d 1349, 1352 (6th Cir. 1993) (same).

As the Supreme Court has recently explained, *Strickland* establishes a high burden that is

difficult to meet, made more so when the deference required by § 2254(d)(1) is applied to review

a state court's application of *Strickland*:

> "Surmounting Strickland's high bar is never an easy task." *Padilla v.*
> *Kentucky*, 559 U.S. ----, ----, 130 S.Ct. 1473, 1485, 176 L.Ed.2d 284 (2010). An
> ineffective-assistance claim can function as a way to escape rules of waiver and
> forfeiture and raise issues not presented at trial, and so the Strickland standard must
> be applied with scrupulous care, lest "intrusive post-trial inquiry" threaten the
> integrity of the very adversary process the right to counsel is meant to serve.
> *Strickland*, 466 U.S., at 689-690, 104 S.Ct. 2052. Even under *de novo* review, the
> standard for judging counsel's representation is a most deferential one. Unlike a later
> reviewing court, the attorney observed the relevant proceedings, knew of materials
> outside the record, and interacted with the client, with opposing counsel, and with
> the judge. It is "all too tempting" to "second-guess counsel's assistance after
> conviction or adverse sentence." *Id*., at 689, 104 S.Ct. 2052; *see also Bell v. Cone*,
> 535 U.S. 685, 702, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002); *Lockhart v. Fretwell*,
> 506 U.S. 364, 372, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). The question is whether
> an attorney's representation amounted to incompetence under "prevailing
> professional norms," not whether it deviated from best practices or most common
> custom. *Strickland*, 466 U.S., at 690, 104 S.Ct. 2052.
> Establishing that a state court's application of *Strickland* was unreasonable
> under § 2254(d) is all the more difficult. The standards created by *Strickland* and §
> 2254(d) are both "highly deferential," *id*., at 689, 104 S.Ct. 2052; *Lindh v. Murphy*,
> 521 U.S. 320, 333, n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two
> apply in tandem, review is "doubly" so, *Knowles*, 556 U.S., at ----, 129 S.Ct. at 1420.
> The *Strickland* standard is a general one, so the range of reasonable applications is
> substantial. 556 U.S., at ----, 129 S.Ct. at 1420 . Federal habeas courts must guard
> against the danger of equating unreasonableness under *Strickland* with
> unreasonableness under § 2254(d). When § 2254(d) applies, the question is not
> whether counsel's actions were reasonable. The question is whether there is any
> reasonable argument that counsel satisfied Strickland's deferential standard.

30

*Harrington v. Richter*, 131 S. Ct. 770, 788 (2011).

    2.    *Analysis*

*a.  Biased Juror*

Petitioner first contends that trial counsel was ineffective for failing to more effectively seek the removal of Juror 32 for cause, or alternatively for failing to exercise a peremptory challenge to remove the juror.  The Michigan Court of Appeals rejected this claim, concluding that petitioner could not show that counsel's decision not to excuse this juror was anything other than a reasonable trial strategy:

> At a post-trial *Ginther* hearing, trial counsel explained that he did not excuse the juror as a matter of strategy, because he believed that the prospective juror would bend over backwards to prove that she could be objective and follow the trial court's instructions. Counsel also stated that he conferred with Patterson, who agreed with his strategy. The trial court found that defense counsel's testimony at the *Ginther* hearing was credible, and we defer to the trial court's determinations of credibility. Considering that trial counsel had the opportunity to evaluate the prospective juror's demeanor in deciding whether to exercise a peremptory challenge, and the trial court's finding that trial counsel's testimony was credible, Patterson has failed to demonstrate that counsel was ineffective for not peremptorily excusing the juror and has not overcome the presumption of sound trial strategy.

*Patterson*, 2011 WL 1902019, at *2; *see also*, Hr'g Tr., dated 1/22/10, at 98.  This determination was reasonable.

"[J]ury selection is a process that inherently falls within the expertise and experience of trial counsel." *Palacio v. State*, 511 S.E.2d 62, 67 (S.C. 1999) (citing cases).  Because of this, counsel's decisions in the jury selection process are the type of strategic decisions which are particularly difficult to attack.  *See Romero v. Lynaugh*, 884 F.2d 871, 878 (5th Cir. 1989); *Cordova v. Johnson*, 993 F. Supp. 473, 530 (W.D. Tex.) (footnote omitted) (internal quotation omitted) ("Selecting a jury is more art than science. There is nothing unreasonable or professionally deficient in a defense

counsel's informed decision to rely upon his own reading of venire members' verbal answers, body language, and overall demeanor[.]"), *aff'd*, 157 F.3d 380 (5th Cir. 1998). Here, counsel testified that he chose to retain Juror 32 because he thought she would tilt in favor of petitioner in an effort to follow the trial court's instructions. Counsel was intimately familiar with the *voir dire* and the juror's demeanor during questioning, and was in the best position to evaluate the pros and cons of retaining Juror 32 on the jury. Petitioner has pointed to nothing to show that counsel's strategic decision was unreasonable, much less that the court of appeals's determination was itself unreasonable.

Further, defendant cannot show that she was prejudiced by counsel's failure to remove Juror 32 from the panel. In order to establish prejudice attributable to a counsel's failure to remove a juror, defendant must show that the juror was actually biased. *See Miller v. Francis*, 269 F.3d 609, 616 (6th Cir. 2001); *Hughes v. United States,* 258 F. 3d 453, 458 (6th Cir. 2001); *Irons v. Lockhart*, 741 F.2d 207, 208 (8th Cir. 1984); *Parker v. Turpin*, 60 F. Supp. 2d 1332, 1362 (N.D. Ga. 1999); *Odle v. Calderon*, 919 F. Supp. 1367, 1389 (N.D. Cal. 1996). As explained in connection with petitioner's substantive juror bias claim, petitioner has failed to establish that Juror 32 was actually biased against her. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

### b. Failure to Raise Confrontation Objection

Petitioner also argues that counsel was ineffective for failing to object to the introduction of Cotoio's statements to the police. The Michigan Court of Appeals's rejection of this argument was reasonable, and thus petitioner is not entitled to habeas relief.

As explained above, counsel did not simply fail to recognize any confrontation problem with

Cotoio's statements and allow the statement to be introduced because he failed to recognize its potential inadmissibility.  Rather, counsel made a strategic decision to allow the evidence to come in because he believed it helped the defense case.  And this strategic decision was not unreasonable.  It is true, as petitioner argues, that Cotoio's statements provided some additional evidence of her involvement in the crimes.  However, significant other evidence of her involvement, including the testimony of the victim and his brother and her appearance at the scene of the arranged money exchange, existed.  This rendered the harmful effect of Cotoio's statements, to the extent they simply tied her to the crimes in general, relatively slight.  On the contrary, however, those statements tended to support her defense that she was merely present during, or at most a passive participant of, the crimes perpetrated by Cotoio.  For example, Officer Sawyer testified that

> Cotoio stated that [Patterson] was his girlfriend at the time and that her ex-boyfriend had come to the apartment and they had gotten into a struggle with the ex-boyfriend, managed to pin him down, handcuffed him with a pair of handcuffs that Ms. Patterson had handed him, and which eventually broke, and there continued another struggle where he ripped his t-shirt off, and, you know, further struggle.  Then he managed to tie him up again and then put him in the car.

Trial Tr., Vol. II, at 110.  On cross-examination, counsel was able to further elicit that Cotoio never indicated that petitioner had planned the assault and kidnapping, *see id*. at 114, and that Cotoio indicated only that it was a struggle "between the two of them," meaning Cotoio and the victim, *see id*.  Similarly, Officer Christian testified to the written statement he took from Cotoio.  In that statement, read to the jury by Office Christian, Cotoio stated:

> On the night of Saturday, 3-16-08, a person from Holly's past calls around 1:00 a.m.  He would like to see her.  This person had, in the past, left her holding the bag on bills he was responsible for.  So we both thought this would be an opportunity to talk to him.  She left to pick him up from down the street at his house.  I stayed home at her house.  When they got back to her house, I was sitting on the couch.  They came through the door and I said quote, hey, unquote.  I could tell he was a little shocked to see me.  He then – excuse me – so then we start in on how he quote

fucked unquote Holly over, and we start – excuse me – he started telling me to quote mind my own business unquote. Then I get heated and call him names. This leads to a fist fight. The fight is very one sided, as I am bigger than he. I pin him to the floor, ask Holly to go get handcuffs out of the office. I put them on him as he kicked at me. So I left him on the floor, looked around the house and found some duct tape and tried to bind his legs. The tape is very old and does not work well. Holly is looking for the emails he sent her so she can read to him what hurtful and stupid things he sent her. As she reads the old emails, he is making jokes about the matter. So this is when I cut off his shirt and tell him I was going to leave him in the snow. So after that we said – excuse me – so after that was said, he broke the handcuffs and was telling us to "f" off and so forth. That's when we started fighting outside the door. I was on tope of him and Holly was trying to make sure either one of us was getting hurt anymore than we already were. This is when he said he would pay her what he owed her and said he would pay tomorrow. We told him tonight, then never call, look, come over, ever again. This was when the call to his brother was made. I was on top of him. Holly was on the phone in the house. At this point, he was clam and told me he was go [sic] with us to pick up the money he owed. After he talked to his brother, we all walked to the truck. His hands were free and he could walk fine on his own. He had one piece of tape on his shoulder and some around his legs. He climbed in the back of the truck and I took the passenger seat. Holly drove. No one said much in the car on the way to meet his brother, as we were just going to let him leave with him.

*Id*. at 121-22. At the evidentiary hearing, counsel testified that he felt this testimony supported the theory that petitioner was merely present. *See* Hr'g Tr., dated 1/22/10, at 39, 45-46, 50. Not only did he want Cotoio to testify, but so did petitioner, and petitioner indicated that the contents of Cotoio's statements were true, *see id*. at 57-58.

Counsel's decision to allow Cotoio's statements into evidence was a reasonable trial strategy. Nothing in Cotoio's statements implicated petitioner in the crimes beyond the abundant evidence already implicating her. And, on the contrary, Cotoio's statements significantly minimized petitioner's role. Under Cotoio's version of events: (1) it was the victim who wanted to come to petitioner's home; (2) there was no prior to plan to assault or restrain the victim; (3) the struggle started as a mutual combat between the victim and Cotoio and did not involve petitioner, other than her getting the handcuffs at Cotoio's request, and indeed she attempted to stop the altercation at one

34

point; (4) the victim eventually agreed to pay the money he owed to petitioner; and (5) the victim

was in no way bound or restrained when the went to get the money from petitioner's brother.  This

evidence significantly assisted petitioner's defense that she was merely present for the unplanned

assault, and that the victim was not kidnapped.  Decisions about what defenses to pursue or not

pursue are "[a]mong the 'virtually unchallengeable' tactical decision left to the judgment of trial

counsel." *Gluzman v. United States*, 124 F. Supp. 2d 171, 174 (S.D.N.Y. 2000).  As a review of

the trial testimony demonstrates, counsel faced a daunting task in representing petitioner.  Keeping

in mind the United States Supreme Court's admonition that, "[t]o counteract the natural tendency

to fault an unsuccessful defense, a court reviewing an ineffective assistance of counsel claim must

'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable

professional assistance,'" *Nix v. Whiteside*, 475 U.S. 157, 165 (1986) (quoting *Strickland*, 466 U.S.

at 689); *see also*, *Griffin v. McVicar*, 84 F.3d 880, 888 (7th Cir. 1996) ("[T]he mere fact that a

defendant chooses one of two available defenses cannot establish ineffective assistance of counsel,

even if the defendant makes a bad choice.").  "Simply because counsel was unsuccessful does not

make him ineffective for Sixth Amendment purposes." *Mayes v. United States*, 93 F. Supp. 2d 882,

891 (E.D. Tenn. 2000).  Here, counsel's choice of defense was reasonable, and in light of that choice

it was reasonable to allow the introduction of Cotoio's statements, which tended to support that

defense.  Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on

this claim.

I.      *Petitioner's Reply*

        In her reply to respondent's answer, petitioner goes far astray from the claims asserted in the

state courts and in her petition.  Most of the reply is a rehashing of the evidence in an attempt to

show her innocence.  Petitioner also asserts numerous additional claims, such as that counsel was

ineffective for advising her not to accept the prosecutor's plea offer, evidence was suppressed, and

that witnesses committed perjury.  These claims are "not properly before the Court, as [they] ha[ve]

not been exhausted in the state courts nor [were they] raised in petitioner's habeas application."

*Hamilton v. Romanowski*, No. 5:10-CV-14392, 2012 WL 2224450, at *13 (May 7, 2012) (Komives,

M.J.), *magistrate judge's report adopted*, 2012 WL 2198790 (E.D. Mich. June 15, 2012) (O'Meara,

J.).  "[A] traverse or reply to an answer to a petition for writ of habeas corpus is not the proper

pleading for a habeas petitioner to raise additional grounds for relief.  A court cannot consider new

issues raised in a traverse or reply to the State's answer."  *Burns v. Lafler*, 328 F. Supp. 2d 711, 724

(E.D. Mich. 2004) (Gadola, J.) (citations omitted) (citing *Cacoperdo v. Demosthenes*, 37 F.3d 504,

507 (9th Cir. 1994); *Lewis v. Witek*, 927 F. Supp. 1288, 1291 n.2 (C.D. Cal. 1996)); *see also*,

*Murphy v. Ohio*, 551 F.3d 485, 502 (6th Cir. 2009) ("We agree with the State's assessment that

Murphy's disclosure claim is not properly before this Court because he first presented it in his

traverse and, thus, failed to exhaust the claim in state court.").

J.      *Petitioner's Motion for Bond*

        In addition to her habeas application, petitioner has filed a motion for bond.  She seeks

release on bond pending disposition of her habeas petition.  The Court should deny this motion.

        "It is recognized that a federal district court has inherent authority to release an inmate on

bail or surety pending the court's decision on a petition for writ of habeas corpus."  *Johnson v.*

*Nelson*, 877 F. Supp. 569, 570 (D. Kan. 1995) (citing cases).  *But cf. In re Roe*, 257 F.3d 1077, 1079

(9th Cir. 2001) (recognizing split in authority as to whether habeas court may order release on bond

pending the district court's resolution of the petition).  However, because a habeas petition

challenges a valid, final state court judgment, principles of federalism and comity require a federal habeas court to tread lightly before interfering with a state's execution of a valid sentence by ordering release on bond. *See Rado v. Meachum*, 699 F. Supp. 25, 26 (D. Conn. 1988); *cf. Cherek v. United States*, 767 F.2d 335, 337-38 (7th Cir. 1985) ("A defendant whose conviction has been affirmed on appeal . . . is unlikely to have been convicted unjustly; hence the case for bail pending resolution of his postconviction proceeding is even weaker than the case for bail pending appeal. And the interest in the finality of criminal proceedings is poorly served by deferring execution of sentence till long after the defendant has been convicted."). Thus, a district court's power to order release pending disposition of an application for habeas relief is "limited" and properly exercised in "special cases only." *Mapp v. Reno*, 241 F.3d 221, 226 (2d Cir. 2001). In order to be entitled to release pending disposition, a habeas petitioner must make two showings. First, she must show that her petition raises substantial constitutional questions on which she is likely to prevail. Second, she must show that "extraordinary or exceptional circumstances exist which either warrant the requested relief or require release to make the writ of habeas corpus an effective remedy." *Johnson*, 877 F. Supp. at 570; *accord Mapp*, 241 F.3d at 226; *Gomez v. United States*, 899 F.2d 1124, 1125 (11th Cir. 1990); *Martin v. Solem*, 801 F.2d 324, 329 (8th Cir. 1986).[2]

Here, for the reasons explained above, petitioner cannot show a substantial probability of success on the merits of her claims. Further, she has failed to demonstrate any special circumstances justifying the extraordinary relief of release on bond. It is not enough for petitioner to show that she

---

[2]A separate set of standards applies when bond is sought after the district court has adjudicated the petition, either granting or denying relief on the merits. *See Hilton v. Braunskill*, 481 U.S. 770 (1987); FED. R. APP. P. 23(b), (c). These separate standards are inapplicable where, as here, a petitioner seeks bond prior to the district court's adjudication of the petition. *See United States v. Stewart*, 127 F. Supp. 2d 670, 672 (E.D. Pa. 2001).

has potentially meritorious claims, or that she has a place to live and work and will not pose a risk

to the community.  In order to make this showing, petitioner must demonstrate that her case is

"distinguishable from other habeas cases."  *Rado*, 699 F. Supp. at 26.  The situations in which

extraordinary circumstances will be found "seem to be limited to situations involving poor health

or the impending completion of the prisoner's sentence." *Landano v. Rafferty*, 970 F.2d 1230, 1239

(3d Cir. 1992).   Petitioner's claim of constitutional error in her trial does not present an

extraordinary circumstance, as "there is nothing unusual about a claim of unlawful confinement in

a habeas proceeding." *Martin*, 801 F.2d at 330.  Nor does petitioner's claim that she is actually

innocent amount to an extraordinary circumstance; a habeas petitioner "comes before the court with

a strong–and in the vast majority of cases conclusive–presumption of guilt." *Schlup v. Delo*, 513

U.S. 298, 326 n.42 (1995).  In short, petitioner has "made no showing of a medical emergency or

any other special circumstance" justifying release on bond.  *Martin*, 801 F.2d at 330.  Thus, she is

not entitled to be released on bond pending the Court's disposition of her application for the writ of

habeas corpus.  *See Roe*, 257 F.3d at 1080-81 (petitioner not entitled to release on bond despite

failing health, the seriousness of the allegations in the petition, petitioner having a place to reside,

and codefendant's statement that petitioner was not involved in the crime); *Landano*, 970 F.2d at

1240-41 (petitioner not entitled to release on bond despite making strong showing of actual

innocence, lack of state court provisions for bond during post-conviction proceedings, and no risk

of flight).

K.     *Recommendation Regarding Certificate of Appealability*

       1.     *Legal Standard*

       As amended by the Antiterrorism and Effective Death Penalty Act, section 2253 provides

that a petitioner may not appeal a denial of an application for a writ of habeas corpus unless a judge issues a certificate of appealability. *See* 28 U.S.C. § 2253(c)(1). The statute further provides that "[a] certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). As the Sixth Circuit has noted, this language represents a codification of the Supreme Court's decision in *Barefoot v. Estelle*, 463 U.S. 880 (1983), and "[t]he AEDPA thus makes no change to the general showing required to obtain a certificate[.]" *Lyons v. Ohio Adult Parole Auth.*, 105 F.3d 1063, 1073 (6th Cir. 1997); *accord Slack v. McDaniel*, 529 U.S. 473, 483 (2000). Although the statute does not define what constitutes a "substantial showing" of a denial of a constitutional right, the burden on the petitioner is obviously less than the burden for establishing entitlement to the writ; otherwise, a certificate could never issue. Rather, the courts that have considered the issue have concluded that "'[a] substantial showing requires the applicant to "demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues (in a different manner); or that the questions are adequate to deserve encouragement to proceed further."'" *Hicks v. Johnson*, 186 F.3d 634, 636 (5th Cir. 1999) (quoting *Drinkard v. Johnson*, 97 F.3d 751, 755 (5th Cir. 1996) (quoting *Barefoot*, 463 U.S. at 893 n.4)); *accord Slack*, 529 U.S. at 483-84. Although the substantive standard is the same, "[t]he new Act does, however, require that certificates of appealability, unlike the former certificates of probable cause, specify which issues are appealable." *Lyons*, 105 F.3d at 1073. (citing 28 U.S.C. § 2253(c)(3)).

Effective December 1, 2009, the newly created Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254, provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."

Rule 11(a), 28 U.S.C. foll. § 2254.  The rule tracks § 2253(c)(3)'s requirement that any grant of a certificate of appealability "state the specific issue or issues that satisfy the showing required by § 2253(c)(2)," Rule 11(a), but omits the requirement contained in the pre-amendment version of Federal Rule of Appellate Procedure 22(b)(1) that the court explain "why a certificate should not issue."  FED. R. APP. P. 22(b)(1) (version effective prior to 2009 amendment); *see id.*, advisory committee note, 2009 amendments.  In light of the new Rule 11 requirement that the Court either grant or deny the certificate of appealability at the time of its final adverse order, I include a recommendation regarding the certificate of appealability issue here.

      2.    *Analysis*

If the Court accepts my recommendation regarding the merits of petitioner's claims, the Court should also conclude that petitioner is not entitled to a certificate of appealability.  It is clear that petitioner's challenges to the scoring of her sentencing guidelines is not cognizable on habeas review, and thus the resolution of this claim is not reasonably debatable.  Further, it is not reasonably debatable that, at least as of the time of the court of appeals's decision in this case, *Apprendi* had no application to Michigan's indeterminate sentencing scheme, and thus the resolution of this claim is not reasonably debatable.  Further, petitioner cannot show that her sentence is grossly disproportionate to her offense or was based on her assertion of her right to trial, and thus the resolution of these claims is not reasonably debatable.  Because of the significant deference given to the trial court's finding of jury impartiality and petitioner's failure to present any clear and convincing evidence to overcome this finding, the resolution of petitioner's jury bias claim is not reasonably debatable.  Likewise, because petitioner actively sought the introduction of Cotoio's statements and thus invited any confrontation error, the resolution of her confrontation claim is not

reasonably debatable.  With respect to petitioner's ineffective assistance claims, as explained above petitioner has failed to show that counsel's decisions to retain Juror 32 and to allow introduction of Cotoio's statements were anything other than reasonable strategic decisions.  Further, it is clear that petitioner cannot establish prejudice, because there is no showing that Juror 32 was actually biased and Cotoio's statements actually assisted her defense.  Accordingly, the Court should conclude that petitioner is not entitled to a certificate of appealability.

L.      *Conclusion*

In view of the foregoing, the Court should conclude that the state courts' resolution of petitioner's claims did not result in a decision which was contrary to, or which involved an unreasonable application of, clearly established federal law.  Accordingly, the Court should deny petitioner's application for the writ of habeas corpus.  If the Court accepts this recommendation, the Court should also deny petitioner a certificate of appealability.  Finally, the Court should deny petitioner's motion for bond.

III.    NOTICE TO PARTIES REGARDING OBJECTIONS:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in FED. R. CIV. P. 72(b)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *See Willis v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991). *Smith v. Detroit Federation of Teachers Local*

*231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.


Date: March 12, 2014                         s/Paul J. Komives_____
                                             PAUL J. KOMIVES
                                             UNITED STATES MAGISTRATE JUDGE


## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing Order was served upon counsel of record via the Court's ECF System to their respective email addresses or First Class U.S. mail to the non-ECF participants on March 12, 2014.


                                             s/ Kay Doaks_____
                                             Case Manager